UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                   :

ELITE UNION INSTALLATIONS, LLC,       :
                                   :
             Plaintiffs,         :
                                   :            20-cv-4761 (LJL)
       -v-                      :
                                   :         OPINION AND ORDER
NATIONAL FIRE INSURANCE COMPANY OF   :
HARTFORD,                            :
                                 :
             Defendant.      :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/13/2021__

LEWIS J. LIMAN, United States District Judge:

Defendant National Fire Insurance Company of Hartford ("National Fire Insurance" or "Defendant") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint filed by Plaintiff Elite Union Installations, LLC ("Elite" or "Plaintiff").

For the following reasons, the motion to dismiss the claims against National Fire is granted.

## BACKGROUND

Defendant is an Illinois-based insurance company which conducts business and issues insurance policies to customers throughout the United States, including in New York. Dkt. No. 24 ("Amended Complaint" or "AC") ¶ 10; Dkt. No. 26 at 12. Plaintiff, a limited liability corporation which specializes in office project and furniture installation, purchased from Defendant CNA Paramount Policy, No. 6013994631, Dkt. No. 27-1 ("the Policy"). The Policy lasted for the period from June 27, 2019 to June 27, 2020. AC ¶¶ 10, 12. In exchange for indemnification for specified losses at its primary location in New York County at 19 West 34th Street, New York, New York 10001 (the "Covered Property"), Plaintiff paid policy premiums to Defendant. *Id.* ¶¶ 11, 15.

## I.    The Insurance Policy

The Policy includes three types of insurance coverage: "Business Property Coverage," "General Liability Coverage," and "Employee Benefits Liability Coverage."  Dkt. No. 27-1 at 13.  Several sections within the Business Property Coverage part of the Policy are relevant to Plaintiff's claim: Business Income Coverage, Extra Expense Coverage, and Denial of Access Coverage (Civil Authority).  Under the Business Income Coverage and Extra Expense Coverage sections, Defendant agrees to the following coverage:[1]

### Business Income Coverage

The Insurer will pay for the actual loss of business income the Named Insured sustains during the period of restoration due to the necessary suspension or delay of operations caused by direct physical loss of or damage to property at a location directly caused by a covered peril.

*     *     *

### Extra Expense Coverage

The Insurer will pay extra expense caused by direct physical loss of or damage to property at a location directly caused by a covered peril.

*Id.* at 79.  The Policy notes that the "period of restoration" begins with "the time and date that the physical loss or damage that causes suspension of operations."  *Id.* at 47–48.  If the insured "resumes operations, with reasonable speed, the period of restoration ends on the earlier of . . . the date when the premises where the loss or damage occurred could have been physically capable of resuming the level of operations which existed prior to the loss or damage; or . . . the date when a new permanent premises is physically capable of resuming the level of operations which existed prior to the loss or damage, if business is resumed at a new permanent premises."  *Id.* at 48.  If the insured fails to resume operations with reasonable speed, the "period of

---

[1] Internal numbering, bullets, and bold emphasis from the policy have been removed.

2

restoration" ends on "the date when the premises where the loss or damage occurred could have been restored to the physical size, construction, configuration and material specifications which existed at the time of loss or damage, with no consideration for any increased period of time." *Id.*

The Civil Authority provisions, which fall under the Denial of Access Coverage section of the Business Property Coverage part of the Policy, state in relevant part:

**Denial of Access Coverage**

To the extent time element coverage is applicable at that location or reported unspecified location, the following coverages apply at the location or reported unspecified location where the suspension or delay of operations occurs:

**Civil Authority**

For up to the number of days shown on the Business Property Schedule of Coverages and Limits, the Insurer will pay, as provided, for:

The actual loss of business income the Named Insured sustains during the period of restoration due to the necessary suspension or delay of operations;

the actual loss of research and development business income the Named Insured sustains during the period of restoration due to the necessary suspension or delay of the research and development projects; and

extra expense, caused by action of civil authority that prohibits access to the location or reported unspecified location. Such action must result from a civil authority's response to direct physical loss of or damage to property located away from a location or reported unspecified location. That lost or damaged property must be within five miles of that location or reported unspecified location which sustains a business income or research and development business income loss or where extra expense is incurred. The loss or damage must be directly caused by a covered peril.

*Id.* at 86–87.

The Policy also contains several exclusions with respect to the Business Property Coverage part. These exclusions apply regardless of whether or not "any other cause or event . . . may have contributed concurrently, or in any sequence, to produce such loss." *Id.* at 100.

The Policy includes an exclusion entitled "Fungi, Wet Rot, Dry Rot, and Microbes," (the "Microbe Exclusion"), which provides in relevant part:

> The Insurer will not pay for loss or damage caused directly or indirectly by or resulting from the presence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or microbes.  However, this exclusion does not apply when fungi, wet or dry rot, or microbes results from fire or lightning.

*Id*.  A nearly identical provision can be found in the "Amendatory Endorsement – New York" section, which further refines coverage under the Business Property Coverage part:

> The Insurer will not pay for loss caused by or resulting from the presence, growth, proliferation, spread or any activity of fungi, wet or dry rot or microbes. However, this exclusion does not apply when fungi, wet or dry rot, or microbes results from a covered peril.

Dkt. No. 27-2 at 177.  The Policy notes that microbes include any "non-fungal microorganism; non-fungal, colony form organism; *virus*; or bacteria."  Dkt. No. 27-1 at 44 (emphasis added and internal numbering removed).

## II.     Impact of COVID-19 and "Civil Authority Orders" on Plaintiff

On March 7, 2020, Governor Cuomo declared a "Disaster Emergency" for the state of New York, authorizing New York state agencies "to take appropriate action to assist local governments and individuals in containing" the spread of the virus.  AC ¶ 73; Dkt. No. 27-3 at 2. Governor Cuomo limited gatherings of large groups on March 12, 2020, Dkt. No. 27-4 at 5, and issued COVID-19-related stay-at-home orders for non-essential workers on March 20, 2020.  AC ¶¶ 74, 75; Dkt. No. 27-5.  The stay-at-home order stated that "essential business[es] or entit[ies] shall not be subject to the in-person restrictions," and could continue providing services as necessary.  Dkt. No. 27-5 at 3.  The Center for Disease Control ("CDC") and the World Health Organization ("WHO") issued warnings throughout the early months of 2020; these warnings addressed the health risks of COVID-19 and the virus' mode of transmission, as well as preventive steps that individuals could take to slow the spread of the disease, including

maintaining social distancing and frequently cleaning and disinfecting common surfaces. AC ¶¶ 61–72. Plaintiff alleges that compliance with the CDC recommendations made it impossible for Plaintiff to operate its business in the usual and customary manner. *Id.* ¶ 69.[2]

Plaintiff closed its physical office doors on March 16, 2020 "as a result of COVID-19 or the [Governor's] Orders." *Id.* ¶ 84. Initially, Plaintiff was able to continue working on several construction projects which had been deemed "essential" by the government. *Id.* ¶ 85. However, on March 27, 2020, Plaintiff was forced to cease all operations after New York narrowed the definition of what constituted "essential" construction work. *Id.* ¶ 86–87. Like many New York businesses during this time, Plaintiff was forced to lay off workers. *Id.* ¶ 88. The remaining employees continued work from home.

Plaintiff claims that the pandemic and the associated Orders damaged the Covered Property by making it "uninhabitable [to] employees and clients," and by requiring the company to make alterations to the property to ensure social distancing. *Id.* ¶¶ 89, 91. According to Plaintiff, "COVID-19 caused direct physical loss of and/or damage to the Covered Properties under the Policy by, among other things, damaging the properties, diminishing the functional physical space of the properties, intruding upon the properties, denying access to the properties, preventing employees and clients from physically occupying the properties, causing the property to be physically uninhabitable by employees and clients, causing its function to be nearly eliminated or destroyed, causing the properties to become substantially unusable, requiring repairs to the property such as alteration to ensure social distancing and to reduce the presence of COVID-19, and/or causing a suspension of business operations on the premises." *Id.* ¶ 91.

---

[2] Plaintiff alleges compliance with the "Civil Authority Orders of *Pennsylvania*" made it impossible to operate; the Court construes Plaintiff's claims to be related to the *New York* orders.

These developments, Plaintiff claims, triggered coverage under the Policy.  Plaintiff seeks

declaratory relief that National Fire Insurance is responsible for covering the losses caused by the

"Civil Authority Orders," or Executive Orders, issued by New York Governor Andrew Cuomo

and the State of New York.  AC ¶¶ 73–76.

## PROCEDURAL HISTORY

Plaintiff filed a complaint against Defendant on June 22, 2020.  Dkt. No. 1.  On

December 18, 2020, Plaintiff filed an amended complaint, seeking a declaration: 1) that the

Orders prohibited Plaintiff's access to the Covered Property and thus triggered coverage under

the Civil Authority provisions of the Policy; and 2) that the Policy provides coverage for

damages caused by COVID-19 itself to the Covered Property.  AC ¶¶ 108–111.  Plaintiff further

seeks a declaratory judgment that Defendant cannot rely on the Policy exclusions.  *Id.*

On January 29, 2021, Defendant filed this motion to dismiss, asserting that Plaintiff

cannot show that its losses were caused by "direct physical loss of or damage to" the covered

location; Defendant also argues that the Orders referenced by the Plaintiff do not trigger the Civil

Authority Coverage of the Policy and that even if coverage was triggered, the virus exclusion

provision would bar any recovery.  Dkt. No. 26.  Plaintiff filed its response in opposition to

Defendant's motion to dismiss on February 26, 2021.  Dkt. No. 28.  On March 12, 2021,

Defendant filed a reply in further support of its motion.  Dkt. No. 30.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a

complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

Although the Court must accept all the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." (internal quotation marks and citation omitted)).

Relying on Federal Rule of Civil Procedure Rule 10(c), the Second Circuit has long held that a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," and that a court may consider documents incorporated in a complaint by reference on a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) without converting it to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. *Cortec Indus. Inv. v. Sum Holdings,* 949 F.2d 42, 47 (2d Cir. 1991); *see also Nicosia v. Amazon.con, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016) ("[S]tatements

7

or documents incorporated in [the complaint] by reference" properly considered on motion to

dismiss).  Those same principles permit the court to consider on a 12(b)(6) motion to dismiss

documents upon which the plaintiff relies in bringing suit, which are integral to the complaint,

and as to which they had notice.  *Cortec*, 949 F.2d at 48.  "In insurance disputes in particular,

courts may consider the insurance policies themselves, even if they are not attached to the

plaintiff's complaint."  *Sharde Harvey, DDS, PLLC v. Sentinel Ins. Co., Ltd.*, 2021 WL 1034259,

at *3 (S.D.N.Y. Mar. 18, 2021).  As Plaintiff's claim rests on the interpretation of language

found in the Policy, the Court will consider Plaintiff's insurance policy in its evaluation.

Courts may also "take judicial notice of certain matters of public record without

converting the motion into one for summary judgment."  *Wells Fargo Bank, N.A. v. Wrights Mill*

*Holdings*, LLC, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).  Matters of public record include,

"things such as statutes, case law, city charters, city ordinances, criminal case dispositions, letter

decisions of government agencies, published reports, records of administrative agencies."

*Rahman v. Schriro*, 22 F. Supp. 3d 305, 311 (S.D.N.Y. 2014) (quoting *Moore U.S.A., Inc. v.*

*Standard Register Co.*, 139 F.Supp.2d 348, 363 (W.D.N.Y. 2001)); *see also Off. Sol. Grp., LLC*

*v. Nat'l Fire Ins. Co. of Hartford*, 2021 WL 2403088, at *4 (S.D.N.Y. June 11, 2021) (treating

Governor Andrew Cuomo's COVID-19-related Executive Orders as matters of public record).

As such, this Court will "take judicial notice of" the New York State Executive Orders relied on

by Plaintiff and attached to Defendant's motion to dismiss: the March 7, 2020 New York State

Executive Order No. 202, Dkt. No. 27-3 (Ex. B), the March 12, 2020 Executive Order No. 202.1,

Dkt. No. 27-4 (Ex. C), the March 20, 2020 New York State Executive Order No. 202.8, Dkt. No.

27-5 (Ex. D), and the March 23, 2020 New York State Executive Order No. 202.10, Dkt. No. 27-

6 (Ex. E).

Under New York law, "insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012). Courts must "give effect to the intent of the parties as expressed in the clear language of their contract." *Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012). The insured party "bears the burden of showing that the insurance contract covers the loss." *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000). "[A]ny ambiguity must be resolved in favor of the insured and against the insurer." *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006).

## DISCUSSION

Plaintiff claims it is entitled to relief under the Business Income, Extra Expense, and the Civil Authority provisions of the Policy. AC ¶ 14; Dkt. No. 27-1 at 79, 86–87. Defendant argues that coverage was not triggered under any of these provisions. Dkt. No. 26 at 10–11.

### A.      Business Income & Extra Expense Coverage

"The initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996); *see also Olin Corp.*, 704 F.3d at 98 ("Under New York law, insurance policies are interpreted according to general rules of contract interpretation."). Therefore, as in ordinary contract disputes, the Court must interpret the disputed insurance policy in a way that "give[s] effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Est.*, 472 F.3d at 42 (quoting *Morgan Stanley Grp.*, 225 F.3d at 276).

"[A]mbiguities in an insurance policy are to be construed against the insurer." *Dean v. Tower Ins. Co. of N.Y.*, 955 N.Y.S.2d 817, 818 (2012) (quoting *Breed v. Ins. Co. of N. Am.*, 413 N.Y.S.2d 352, 385 (1978)). A provision is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the

9

context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).  However, "[i]f the provisions are clear and unambiguous, courts are to enforce them as written." *Michael Cetta, Inc. v. Admiral Indem. Co.*, 506 F. Supp. 3d 168, 175-76 (S.D.N.Y. 2020) (quoting *Vill. of Sylvan Beach, N.Y. v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995)).  Furthermore, "[i]t is well established under New York law that [the] policyholder bears the burden of showing that the insurance contract covers the loss." *Morgan Stanley Grp.*, 225 F.3d at 276.  Thus, Plaintiff here bears the burden of demonstrating coverage.

The Policy provides that coverage is triggered in the event that the insured party suffers a "direct physical loss of or damages to property."  Dkt. No. 21, Ex. A at 78.  Plaintiff puts forward two arguments why it suffered a "direct physical loss."  First, it argues that the "loss of use of property . . . constitutes loss or damage."  AC ¶ 41; *see also id.* ¶ 54 (emphasizing "loss of use"); *id.* ¶ 89 (arguing Plaintiff's inability to use the property "as intended" constitutes direct physical loss).  Second, it argues that "the presence of, or inherent risk of the existence of, the COVID-19 molecule" constitutes "direct physical loss."  *Id.* ¶¶ 41, 91 (articulating how COVID-19 itself damaged the property and forced Plaintiff to make alterations to conform with social distancing protocols).  Both of these arguments are unavailing.

New York courts have held that the "loss of use" of one's business does not trigger coverage under policies that require direct physical loss of or damage to property.  In *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 751 N.Y.S.2d 4 (1st Dep't 2002), for example, the City of New York had prohibited access to a street after a scaffolding collapse.  *Id.* at 5.  A theatre company was compelled to cancel a number of performances due to the street closure, but

not due to damage to the building in which the performances were to be held.  *Id.* at 7.  The company's business interruption insurance policy used the same language as the policy here, insuring the company against losses incurred as a result of "direct physical loss or damage to the property."  *Id.*  The court held that coverage was "limited to losses involving physical damage to the insured's property."  *Id.*; *see also id.* at 4 (holding that the language "direct physical loss or damage . . . clearly and unambiguously provides coverage only where the insured's property suffers direct physical damages").  The court thus rejected the argument that the phrase "loss of" can include the "loss of the use of" a business.

Similarly, here, the language of the Policy requires "direct physical loss of or damage to" the premises.  In order for the loss to be physical, it must be tangible or material.  *See, e.g.*, Physical, Black's Law Dictionary (11th ed. 2019) ("Of, relating to, or involving material things; pertaining to real, tangible objects").  The "requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal."  10A Couch on Insurance § 148:46 (3d ed. 2005).  The loss of use of property alone is not "physical," and thus does not qualify as a direct physical loss.  *See Newman Myers Kreines Gross v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) ("The words 'direct' and 'physical,' which ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure."); *id.* (holding that the "critical policy language here—'direct physical loss or damage'—similarly, and unambiguously, requires some form of actual, physical damage to the insured premises to trigger loss of business income and extra expense coverage.").

That interpretation is bolstered by considering the coverage language in the context of the policy as a whole.  *See, e.g., N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 125 (2d Cir. 2001) ("[T]he expressed intent of the parties is to be ascertained by examining the . . . policy as a whole. . . .  [T]he policy must be construed in its entirety, with each clause interpreted in relation to others contained therein.  All its words, parts, and provisions must be construed together as one entire contract, each part interpreted in light of the other parts." (quoting 2 *Couch on Insurance* § 21:19)); *Newman Myers Kreines Gross Harris*, 17 F. Supp. 3d at 332 ("Although not necessary to the Court's decision on this point, other provisions of the policy at issue here support this interpretation.").  The Business Income Coverage section of the Policy requires the insurer to "pay for the actual loss of business income the Named Insured sustains during the *period of restoration*."  Dkt. No. 27-1 at 79 (emphasis added).  The "period of restoration," in turn, refers to the time period necessary for the Covered Property to be restored to its previous "physical size, construction, configuration and material specifications," or, in the alternative, if the insured "resumes operations, with reasonable speed, . . . the date when the premises where the loss or damage occurred could have been physically capable of resuming the level of operations which existed prior to the loss or damage.  *Id.* at 48.  It follows that the event triggering coverage must be some event that alters the Covered Property's "physical site, construction, configuration [or] material specifications" or that renders the premises "physically" incapable of operating and for which restoration is necessary.  *See, e.g.*, *Michael Cetta*, 506 F. Supp. 3d at 177 (noting the fact that the "period of restoration" lasted until the covered location was "'repaired, rebuilt, or replaced' suggests the occurrence of material harm that then requires a physical fix").  Were it otherwise, the language explaining the period of restoration would be rendered meaningless:  There would be no change to a "physical size, construction, configuration

[or] material specifications" to be restored, as the alleged loss of use here would not require
repairs to the building in order for operations to resume.  Thus, looking at the plain language of
the Policy and the "period of restoration" requirements together, it is apparent that an inability to
use the property—without more and absent some physical change to the property requiring
restoration—is not sufficient to constitute "direct physical loss or damage" and trigger coverage.
*Id.* at 178 ("[T]he reading that gives effect to all provisions of the Policy is that 'direct physical
loss or damage' requires actual, physical damage to the insured premises.") (internal quotations
and citations omitted).

Courts that have considered the question whether the loss of use of a business caused by
COVID-19 qualifies as a "direct physical loss" under New York law have uniformly determined
that it does not.  *See, e.g.*, *Soc. Life Mag. Inc. v. Sentinel Ins. Co. Ltd.*, 2020 WL 2904834
(S.D.N.Y. May 14, 2020) ("New York law is clear that this kind of business interruption needs
some damage to the property to prohibit [a person] from going there."); *10012 Holdings, Inc. v.
Sentinel Ins. Co., Ltd.*, 2020 WL 7360252, at *1 (S.D.N.Y. Dec. 15, 2020) (holding that business
operations interrupted by COVID-19 did not qualify as a "direct physical loss" for purposes of
insurance contract); *Michael Cetta*, 506 F. Supp. 3d at 170-72 (same); *Tappo of Buffalo, LLC v.
Erie Ins. Co.*, 2020 WL 7867553, at *4 (W.D.N.Y. Dec. 29, 2020) (same); *Rye Ridge Corp. v.
Cincinnati Ins. Co.*, 2021 WL 1600475, at  *2-3 (S.D.N.Y. Apr. 23, 2021) (same); *Sharde
Harvey, DDS, PLLC*, 2021 WL 1034259, at *6 (same); *Off. Sol. Grp.*, 2021 WL 2403088, at *7
("As in the many analogous cases that have been brought in New York courts over the past year,
the Court concludes here that the plain meaning of 'direct physical loss or damage'
unambiguously requires physical damage to the covered property to invoke coverage and that

13

loss of usage does not rise to the level of physical damage.  Plaintiff has failed to allege such loss or damage occurred throughout its closure, other than having its doors closed to the public.").

Plaintiff contends that "loss of use" language is explicitly included in the Policy.  Dkt. No. 28 at 14–15.  Plaintiff states, "the Policy does define 'property damage' to mean, in part, 'loss of use of tangible property that is not physically injured.'"  *Id.*  However, as Defendant points out, this definition appears in the Commercial General Liability Coverage section of the Policy.  Dkt. No. 27-1 at 140.  The definition cannot be found within the Business Property Coverage part, which addresses "direct physical loss or damage" and not "property damage" and includes the provisions on "Business Income" and "Extra Expense" that Plaintiff argues were triggered.  The fact that "property damage" is defined to include "loss of use" in the Commercial General Liability Coverage part, but not in the Business Property Coverage part, thus does not support Plaintiff's argument but rather suggests that the parties knew how to refer to the loss of use of property that is not physically damaged when they wanted to and did not refer to such loss of use of property for Business Property Coverage.  *See, e.g.*, *Michael Cetta*, 506 F. Supp. 3d at 181 (emphasizing "the fact that the Policy includes several different definition sections counsels against" applying the definitions used in one section of the policy to another).  As "the business income coverage and commercial general liability sections protect wholly different interests . . . [t]he Court sees no reason to cross wires between different definition sections."  *Id.*  (internal quotations and citations omitted).

Plaintiff additionally argues that, although it is not seeking "any determination of whether the Coronavirus is physically in or at the Covered Properties," AC ¶ 112, nonetheless "the high probability of illness and contamination continues to prevent the full physical use of the properties" and thus constitutes "direct physical loss of or damage to" the Covered Property.

Dkt. No. 28 at 10.  Plaintiff relies upon *Schlamm Stone & Dolan LLP v. Seneca Insurance Co.*, 2005 WL 600021 (N.Y. Sup. Ct. Mar. 4, 2005), in which a trial court denied summary judgment, finding that "the presence of noxious particles, particularly in the air" could constitute property damage.  *Id.* at *4.  Here, however, unlike in *Schlamm Stone*, Plaintiff has offered no allegation that COVID-19 was actually present at the Covered Property.  Instead, Plaintiff's complaint expressly disclaims any inquiry into the question.  And even if Plaintiff had offered such an allegation, liability would have been excluded under the "Fungi, Wet Rot, Dry Rot, and Microbes" exclusions, discussed *infra*.

### B.    Civil Authority Coverage

Plaintiff additionally argues that it is entitled to recovery under the Policy's Civil Authority provision.  Under the Civil Authority section, National Fire commits to covering extra expenses where civil authorities have "prohibit[ed] access to the [covered] location. . . . Such action must result from a civil authority's response to direct physical loss of or damage to property located . . . within five miles of the [covered] location."  Dkt. No. 27-1 at 87.  Coverage may apply, for example, if a "building next door to [an insured] theater is damaged by first; for safety reasons, the civil authorities issue an order closing the [insured] theater during repairs to the adjacent building."  *Syufy Enters. v. Home Ins. Co. of Ind.*, 1995 WL 129229, at *2 n.1 (N.D. Cal. Mar. 21, 1995); 10A *Couch on Insurance* § 152:22 ("Unlike losses caused by violence or warlike activity . . . some losses occur because of the actions of a civil authority functioning in its ordinary capacity.").  To show coverage under the Civil Authority provision, Plaintiff must allege (1) that a civil authority order prohibited access to Plaintiff's office; and (2) that the order

was directed in response to physical damage in the five-mile area surrounding the Covered

Property.

Plaintiff fails adequately to allege either of these requirements.  Plaintiff claims it was

"specifically prohibited by order of civil authority" from accessing its office.  AC ¶ 16.

However, the executive orders Plaintiff cites in the Amended Complaint do not "prohibit"

individuals from entering the premises.  For example, the March 20, 2020 stay-at-home

order states:

> "[a]ll businesses and not-for-profits in the state shall utilize, *to the maximum extent possible*, any telecommuting or work from home procedures that they can safely utilize. Each employer *shall reduce the in-person workforce* at any work locations by 100% no later than March 22 at 8 p.m."

Dkt. No. 27-5 at 3 (emphasis added).  Encouraging businesses to implement work-from-home

protocols and requiring that businesses limit the number of individuals *working* in an office is

not the same as "prohibiting" individuals from accessing an insured location.  *See, e.g.*, *54th St.*

*Ltd. Partners, L.P. v. Fid. and Guar. Ins. Co.*, 763 N.Y.S.2d 243, 244 (N.Y. App. Div. 1st Dept.

2003) (finding access to a covered location was not "prohibited" where the property "was

accessible to the public, plaintiff's employees and its vendors"); *Sharde Harvey,* 2021 WL

1034259, at *13 ("[L]imiting access is distinct from prohibiting access, such as in a situation

where an unsafe condition at an adjoining building would require a safety evacuation.")*; Off. Sol.*

*Grp.*, 2021 WL 2403088, at *8 ("The plain language of the Executive Orders limited the

presence of in-person employees at the location, but notably did not prohibit access to the

premises outright. There is no prohibition that prevents employers from accessing the property

for any variety of reasons, such as sorting mail or collecting personal items."); *Food for Thought*

*Caterers Corp. v. Sentinel Ins. Co., Ltd.*, 2021 WL 860345, at *6 (S.D.N.Y. Mar. 6, 2021)

("[B]ecause no civil authority order *denied complete access* to the plaintiff's premises, the

Amended Complaint fails to allege that access was 'specifically prohibited.'" (citing *Abner,*

*Herrman & Brock, Inc. v. Great N. Ins. Co.*, 308 F. Supp. 2d 331, 333, 336 (S.D.N.Y. 2004))

(emphasis added)).

Second, Plaintiff cannot allege that the civil authority orders were issued in direct

response to physical damage in the five-mile area surrounding the Covered Property.  Plaintiff

argues there was a "physical impact . . . around the surrounding location of Plaintiff's business

properties in light of COVID-19 presence." AC ¶ 95.  However, the New York state government

explicitly stated that their objective in mandating that only essential workers return to work was

"to facilitate the most timely and effective response to the COVID-19 emergency disaster."  Dkt.

No. 27-5 at 2.  None of the orders referred to in the Amended Complaint were issued specifically

in response to physical damage in the area surrounding Plaintiff's office.  Furthermore, "the gist

of Civil Authority coverage is that physical harm to *someone else's premises* has caused the civil

authorities to prohibit access to the insured's premises." *Visconti Bus Serv., LLC v. Utica Nat'l*

*Ins. Grp.*, 142 N.Y.S.3d 903, 917 (N.Y. Sup. Ct. 2021) (emphasis added).  Plaintiff states:

"[R]egarding the loss of the Covered Property caused by New York's Orders, property other than

at the Covered Property was likewise damaged by those same Orders, and in response to the

same dangerous condition."  Dkt. No. 28 at 23.  As the Court concluded above, Plaintiff has not

alleged "physical loss" to its property.  Therefore, Plaintiff's allegations that property other than

the Covered Property was damaged in the same way is not sufficient to allege "direct physical

loss" to the surrounding areas.

### A.  The Microbe Exclusion

Even if Plaintiff had adequately pleaded coverage under one of the Policy's provisions,

Plaintiff's claim would nonetheless be dismissed under the Policy's virus exclusion.  The Policy

excludes coverage for damage to property "directly or indirectly caused by or resulting from . . . microbes." Dkt. No. 27, Ex. A at 99, 413.  Microbes are defined to include "any virus." *Id.* at 43.  The exclusion applies "regardless of: the causes of such excluded causes or events; other causes of such loss; [and] any other cause or event, whether or not insured under the coverage party, which may have contributed concurrently, or in any sequence, to produce such loss even if such other cause or event would otherwise be covered[.]" *Id.* at 99.

Under New York law, coverage is not available where an "exclusion is stated in clear and unambiguous language, is subject to no other reasonable interpretation, and applies in the particular case." *Dollar Phone Corp. v. St. Paul Fire & Marine Ins. Co.*, 514 F. App'x 21, 22 (2d Cir. 2013); *see also A. Cas. Ins. Co. v. Greenwich Ins. Co.*, 548 F. App'x. 716, 717 (2d Cir. 2013) ("Under New York law, if the policy language is clear and unambiguous, courts are to enforce [the terms] as written.").  The plain language of the Microbe Exclusion unambiguously excludes coverage for losses resulting from a virus.  Plaintiff has not alleged—nor could it—that COVID-19 is not a virus.

Plaintiff raises two arguments in response.  First, Plaintiff argues that the Microbe Exclusion is ambiguous.  Plaintiff argues that the Policy was not drafted to address pandemic-associated losses and that the term "virus" is "subject to more than one reasonable interpretation especially when applied to the novel factual circumstances present." Dkt. No. 28 at 19.  This argument is unavailing.  Under general principles of contract law, a court looks to the meaning of the contract and not to the subjective intent of the drafters, where the language of the contract is unambiguous.  *See Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous. . . . When an agreement is unambiguous on its fact, it must be

enforced according to the plain meaning of its terms."). "[A]ny ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Lee v. BSB Greenwich Mortg. Ltd. P'ship*, 267 F.3d 172, 179 (2d Cir. 2001) (quoting *Tallmadge Bros. v. Iroquois Gas Tramission Sys., L.P.*, 746 A.2d 1277, 1288 (Conn. 2000)). "'Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation,' unless each is a 'reasonable' interpretation." *Maverick Tube*, 595 F.3d at 467 (quoting *Hunn Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). Here, the Policy is unambiguous. The COVID-19 pandemic may have been unanticipated but the language clearly states that the insurer is not responsible for "damages caused directly or indirectly" by the presence of "*any . . . virus.*" Dkt. No. 27-1 at 100, 44 (emphasis added). The language is broad. *See In re Watson's Will*, 258 N.Y.S. 755, 775 (N.Y. Surr. Ct. 1932) ("The word 'any' . . . is a pronoun, and is defined by the lexicographers as meaning 'all,' 'every,' 'an indefinite number,' and, so used, has a comprehensive meaning."). COVID-19 undoubtedly falls within the category of "any . . . virus." *See, e.g.*, *Off. Sol. Grp.*, 2021 WL 2403088, at *9 ("That the word 'pandemic' is absent is irrelevant when the word 'any' is used, indicating that viruses of all varieties are included. The express language of the Policy indicates that the COVID-19 virus is included under 'microbe' as 'any . . . virus,' barring Plaintiff from coverage."); *100 Orchard St., LLC v. Travelers Indem. Ins. Co. of Am.*, 2021 WL 2333244, at *2 (S.D.N.Y. June 8, 2021) ("[I]n the context of a viral pandemic, the word 'pandemic' describes a disease's geographic prevalence; it does not replace disease as the harm-causing agent." (internal quotations and citations omitted)). Moreover, Plaintiff does not describe how the term "virus" could be susceptible to "more than one reasonable interpretation," and, as the multitude of caselaw on the issue suggests, this is not a

"novel factual circumstance."  *See, e.g.*, *100 Orchard St.*, 2021 WL 2333244, at *2 (finding a similar virus exclusion would apply to losses caused by the COVID-19 virus); *Off. Sol. Grp.,* 2021 WL 2403088, at *9 (same); *Michael J. Redenburg, Esq. PC v. Midvale Indemnity Co.*, 2021 WL 276655, at *7 (S.D.N.Y. Jan. 27, 2021) (same).  Accordingly, the language of the Microbe Exclusion is unambiguous and excludes losses from viruses.

Second, Plaintiff argues that the virus exclusion should not apply because it is alleging "that the Civil Authority Orders caused its losses and not the virus itself."  Dkt. No. 28 at 26. This argument not only undermines Plaintiff's earlier argument that the virus itself could have caused physical damage to the Covered Property, but it also would not remove Plaintiff's claims from the scope of the virus exclusion.  The language of the exclusion states that the insurer is not responsible for damages stemming "directly or *indirectly*" from a virus.  Dkt. No. 27-1 at 100. The Civil Authority Orders were imposed as a result of the COVID-19 virus, meaning that, at the very least, they were indirectly caused by the virus.  *See Indirectly*, Oxford English Dictionary ("By indirect action, means, connection, agency, or instrumentality; through some intervening person or thing; mediately.").  Furthermore, the Microbe Exclusion applies regardless of whether another event, such a stay-at-home order, "may have contributed concurrently, or in any sequence, to produce such loss."  Dkt. No. 27-1 at 100  Therefore, simply because the "state's stay-at-home orders were, in the sequence of causation, one step more proximate to [Plaintiff's] losses than the virus, [that] does not bring [Plaintiff's] claims outside the exclusion."  *Michael J. Redenburg, Esq.*, 2021 WL 276655, at *7.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to close the motion at Dkt. No. 25.  In light of the Court's finding that no

liability can arise under the Policy for losses suffered as a result of the Civil Authority Orders issued in response to the COVID-19 pandemic, amendment would be futile and the dismissal of the complaint is with prejudice. *See Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir. 1999) (holding that it is appropriate to deny leave to amend where "it is 'beyond doubt that the plaintiff can prove no set of facts in support' of his amended claims" (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991))); *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 338 (S.D.N.Y. 2010) (denying leave to amend where there was "no additional substantive information [plaintiff] could offer to cure the deficient pleadings with respect to her . . . claim"). The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: September 13, 2021
      New York, New York

LEWIS J. LIMAN
United States District Judge